UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CARLOS HUBERT QUISPE-ARDILES, *et al*.,

    *Petitioners*,

v.

KRISTI NOEM, *et al*.,

    *Respondents*.

1:25-cv-01382-MSN-WEF

**MEMORANDUM OPINION AND ORDER**

**I.   INTRODUCTION**

Petitioner Carlos Hubert Quispe-Ardiles, a native and citizen of Peru, has filed a six-count Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory Relief ("Petition"), challenging the lawfulness of his detention by Immigration and Customs Enforcement ("ICE"). ECF 2.[1] Mr. Quispe-Ardiles is currently detained at the Farmville Detention Center ("FDC"), an immigration detention center within this Court's jurisdiction. In his Petition, Mr. Quispe-Ardiles challenges the Department of Homeland Security's ("DHS") characterization of his status as an "arriving alien" pursuant to 8 U.S.C. § 1225(b) (Count I) and his detention without bond in violation of 8 U.S.C. § 1226(a) (Count II). Mr. Quispe-Ardiles further alleges that DHS's invocation of the automatic stay of his release pursuant to 8 C.F.R. § 1003.19(i)(2), after an Immigration Judge ("IJ") ordered him release on bond, is *ultra vires* (Count IV) and violates his substantive and procedural due process rights (Count V; *see also* Count III). Lastly, he alleges that

---

[1] The Petition originally sought relief for Mr. Quispe-Ardiles and a second petitioner, Sergio Gerson Hernandez Perez. ECF 1. On September 15, 2025, however, the parties entered a stipulation of dismissal as to Petitioner Sergio Gerson Hernandez Perez, representing that he had since been released from ICE custody. ECF 13. Accordingly, only Mr. Quispe-Ardiles's Petition remains.

DHS has failed to comply with the procedures set forth in the automatic stay regulation, 8 C.F.R. § 1003.6(c)(1) (Count VI). Mr. Quispe-Ardiles seeks, among other things, his immediate release from ICE custody.

For the reasons that follow, this Court concludes that Mr. Quispe-Ardiles is detained pursuant to 8 U.S.C. § 1226(a), and that the stay of his release from detention on bond through the stay regulation, 8 C.F.R. § 1003.19(i)(2), violates his rights to substantive and procedural due process. Accordingly, this Court grants Mr. Quispe-Ardiles's Petition as to Counts I, II, III, and V.[2]

## II.   BACKGROUND

On December 6, 2023, Mr. Quispe-Ardiles entered the United States without inspection near San Luis, Arizona. ECF 2-1 at 1. Border Patrol agents arrested him the next day, on December 7, 2023, (*see* ECF 2-6 at 2), and DHS issued him a Notice to Appear (ECF 2-1).[3] That same day, DHS released Mr. Quispe-Ardiles on his own recognizance "[i]n accordance with section 236 of the Immigration and Nationality Act."[4] ECF 2 ¶ 29; ECF 2-2.

Mr. Quispe-Ardiles subsequently moved to Herdon, Virginia, and began to establish a life there. ECF 2 ¶ 29; ECF 2-5 at 4. He became involved with his community and church and became a "loving and involved grandfather." ECF 2-5 at 4.

On June 17, 2024, Mr. Quispe-Ardiles filed a Form I-589, Application for Asylum and Withholding of Removal. ECF 2 ¶ 30; ECF 2-3. A year later, on July 17, 2025, he attended a preliminary hearing before an IJ in Annandale, Virginia. ECF 2 ¶ 31. During the hearing, the IJ set

---

[2] Because the Court grants relief on due process grounds, it need not address Mr. Quispe-Ardiles's claims that the automatic stay regulation is *ultra vires* (Count VI), or that DHS failed to follow the proper procedure in invoking the automatic stay regulation (Count VI).

[3] A Notice to Appear is a "[c]harging document" that "initiates a proceeding before an Immigration Judge." 8 C.F.R. § 1003.13).

[4] Section 236 of the Immigration and Nationality Act is codified at 8 U.S.C. § 1226.

2

Mr. Quispe-Ardiles's asylum application for trial on April 6, 2026. *Id.*; ECF 2-4. As Mr. Quispe-Ardiles left the hearing, ICE agents stopped him in the courthouse hallway, arrested, and detained him. ECF 2 ¶ 31. That same day, Mr. Quispe-Ardiles filed a Motion for Custody Redetermination, requesting that an IJ review his custody status and grant him bond. *Id.* at ¶ 32.

On July 30, 2025, an IJ held a hearing on Mr. Quispe-Ardiles's request for bond.[5] At the hearing, DHS asserted that Mr. Quispe-Ardiles was an "applicant for admission" and was therefore subject to mandatory detention under 8 U.S.C. § 1225(b)(2). ECF 2-5 at 2. The IJ, however, rejected DHS's position, noting that DHS had consistently treated Mr. Quispe-Ardiles as subject to 8 U.S.C. § 1226(a), and therefore eligible for release on bond. *Id.* at 2-3. In particular, the IJ observed that DHS had released Mr. Quispe-Ardiles on an order of recognizance, detained him pursuant to a warrant of arrest "issued by DHS years after his entry into the United States," and placed him in "full removal proceedings." *Id.* at 3. The IJ concluded that, because Mr. Quispe-Ardiles was detained pursuant to 8 U.S.C. § 1226(a), she had jurisdiction to conduct bond proceedings. *Id.* She determined that Mr. Quispe-Ardiles had no criminal history and did not pose a flight risk and granted Mr. Quispe-Ardiles bond in the amount of $1,500, the statutory minimum.[6] *Id.* at 4.

Before Mr. Quispe-Ardiles could secure his release, ICE filed a Form EOIR-43, Notice of Intent to Appeal Custody Redetermination, automatically staying the IJ's bond order pursuant to 8 C.F.R. § 1003.19(i)(2). ECF 2-7. ICE perfected the form by filing a notice of appeal of the IJ's

---

[5] While there is some discrepancy in the record as to when this hearing occurred, the IJ's written order indicates that the hearing occurred on July 30, 2025. ECF 2-5 at 1.
[6] 8 U.S.C. § 1226(a)(2)(A) provides that, after arresting and detaining a noncitizen, the Attorney General may "release the alien" pending a removal decision "on bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General."

3

bond determination on August 13, 2025. ECF 2-8. Mr. Quispe-Ardiles—who has no criminal history—has been detained at FDC since. ECF 1 ¶ 38, 2-5.

On August 22, 2025, Mr. Quispe-Ardiles filed a Petition for Writ of Habeas Corpus and Complaint for Declaratory Relief (ECF 1), which he amended on August 27, 2025 (ECF 2). His Petition names Kristi Noem, the DHS Secretary; Todd M. Lyons, the Acting Director of ICE; Pamela Bondi, the Attorney General; and Joseph Simon, the Field Office Director of ICE's Washington Field Office (collectively "federal respondents"). ECF 2. The Petition also names Jeffrey Crawford, the warden of FDC. *Id.* On September 9, 2025, federal respondents filed a response (ECF 6) that is virtually identical to a response the federal respondents filed in a similar habeas case, *Hasan v. Crawford*, also filed in this district. *See* Federal Respondents' Memorandum in Opposition to the Petition for a Writ of Habeas Corpus, *Hasan v. Crawford*, No. 1:25-cv-1408 (LMB/IDD), 2025 WL 2682255 (E.D. Va. Sept. 19, 2025). On September 19, 2025, Judge Brinkema granted the petitioner's request for habeas relief in *Hasan*, addressing many of the arguments that Respondents raise here.[7] *See Hasan*, 2025 WL 2682255.

### III. ANALYSIS

#### A. Jurisdiction

As an initial matter, the federal respondents argue, as they did in *Hasan*, 2025 WL 2682255, at *3-4, that this Court lacks jurisdiction to review Mr. Quispe-Ardiles's habeas claims.[8] ECF 6 at 10-12.

---

[7] On September 29, 2025, another court in this district granted a petitioner's request for habeas relief in yet another case that is strikingly similar to the one at hand. *See Luna Quispe v. Crawford*, No. 1:25-cv-1471-ATJ-LRV (E.D. Va. Sept. 29, 2025).

[8] The federal respondents do not contest this Court's jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202.

4

Under 28 U.S.C. § 2241(c)(3), a district court may grant a writ of habeas corpus to any person who demonstrates that he is "in custody in violation of the Constitution or laws or treaties of the United States." Historically, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). In the immigration context, habeas is "regularly invoked on behalf of noncitizens." *Hasan*, 2025 WL 2682255, at *3 (quoting *St. Cyr*, 533 U.S. at 305).

Federal respondents nevertheless argue, first, that, under 8 U.S.C. § 1252(b)(9), Mr. Quispe-Ardiles may only challenge his detention in immigration court. ECF 6 at 10-11. Second, they argue that 8 U.S.C. § 1252(g) "specifically deprives" this court of habeas jurisdiction. *Id.* at 11. Finally, they argue that Mr. Quispe-Ardiles may not use habeas to "assert[] claims under the [Immigration and Nationality Act ("INA")]," which they define to include his due process claims. *Id.* at 12-13. The Court disagrees and concludes that it has jurisdiction to address Mr. Quispe-Ardiles's Petition.[9]

### 1. 8 U.S.C. § 1252(b)(9)

First, the federal respondents rely on 8 U.S.C. § 1252(b)(9) to argue that Mr. Quispe-Ardiles may only contest the legality of his detention by bringing claims in immigration court, not in federal district court.

Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any

---

[9] Other federal courts have similarly concluded that these jurisdiction-stripping provisions do not deprive federal courts of jurisdiction to review a noncitizen's challenge to the legality of his detention. *See, e.g.*, *Maldonado v. Olson*, No. 25-CV-3142 (SRN/SGE), 2025 WL 2374411, at *4-8 (D. Minn. Aug. 15, 2025); *Leal-Hernandez v. Noem*, No. 1:25-CV-02428-JRR, 2025 WL 2430025, at *5-7 (D. Md. Aug. 24, 2025); *Hasan*, 2025 WL 2682255, at *3 n.7 (collecting cases).

action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." As the Supreme Court has explained, the provision only limits "review of an order of removal." *St. Cyr*, 533 U.S. at 313 (quoting 8 U.S.C. § 1252(b)). The Court has further cautioned that the phrase "an order of removal" should be narrowly construed. *See Jennings v. Rodriguez*, 583 U.S. 281, 294-95 (2018). Where a petitioner is not "asking for review of an order of removal" or "challenging any part of the process by which their removability will be determined . . . § 1252(b)(9) does not present a jurisdictional bar." *Id*.

Mr. Quispe-Ardiles does not challenge an order of removal or any part of the process by which his removability will be determined. Instead, he challenges his detention, which is "separate and apart from . . . any deportation or removal hearing or proceeding." 8 C.F.R. § 1003.19(d); *see also Hasan*, 2025 WL 2682255, at *4. Section 1252(b)(9) thus does not prevent this Court from considering Mr. Quispe-Ardiles's Petition.

### 2. 8 U.S.C. § 1252(g)

The federal respondents next assert that § 1252(g) insulates Mr. Quispe-Ardiles's Petition from review. ECF 6 at 10-11. They contend that § 1252(g) "specifically deprives courts of jurisdiction, including habeas corpus jurisdiction, to review 'any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to [1] commence proceedings, [2] adjudicate cases, or [3] execute removal orders against any alien under this chapter.'" ECF 6 at 11 (quoting 8 U.S.C. § 1252(g)).

Section 1252(g) has no application here. While § 1252(g) strips federal courts of jurisdiction to hear certain claims, the Supreme Court has been clear that provision does not "refer[] to all claims arising from deportation proceedings." *Reno v. Am.-Arab Anti-Discrimination*

*Comm.*, 525 U.S. 471, 482 (1999). The provision "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'" *Id.* (quoting 8 U.S.C. § 1252(g)) (emphasis omitted); *see also Jennings*, 583 U.S. at 294 (explaining that the Court has "read the language" of § 1252(g) "to refer to just those three specific actions themselves."). Mr. Quispe-Ardiles's Petition does not challenge the commencement of removal proceedings, the adjudication of removal proceedings, or the execution of removal proceedings. Indeed, "no removal proceedings have begun, been adjudicated, or resulted in any removal orders executed against [Mr. Quispe-Ardiles]." *Hasan*, 2025 WL 2682255, at *4. On the contrary, Mr. Quispe-Ardiles's claims for constitutional and declaratory relief are "independent of, and collateral to, the removal process." *Maldonado v. Olson*, No. 25-CV-3142 (SRN/SGE), 2025 WL 2374411, at *6 (D. Minn. Aug. 15, 2025) (quoting *Ozturk v. Hyde*, 136 F.4th 382, 397-98 (2d Cir. 2025)). Accordingly, § 1252(g) does not bar this Court's review.

### 3. Review Under the INA

Lastly, federal respondents argue that Mr. Quispe-Ardiles's due process claims should be characterized as civil claims brought under the INA, which he may only assert through a separate civil action.[10] ECF 6 at 112-13. This assertion is somewhat confounding. Due process claims arise under the Fifth Amendment of the Constitution, not the INA. *See* U.S. Const, amend. V (providing that [n]o person shall be . . . deprived of life, liberty, or property, without due process of law"). And it has long been settled law that noncitizens may raise due process claims through habeas petitions. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001) (noting "at the outset" that 28

---

[10] Because this Court grants relief based on Mr. Quispe-Ardiles's due process claims, it need not consider federal respondents' jurisdictional challenge to his claims that the automatic stay regulation is *ultra vires* or that federal defendants did not properly follow the automatic stay regulation's processes. *See* ECF 6 at 12-13.

7

U.S.C. § 2241 "confers jurisdiction upon the federal courts" to hear noncitizens' "statutory and constitutional challenges" to deportation and exclusion orders). This Court therefore concludes that it possesses jurisdiction to consider Mr. Quispe-Ardiles's Petition.

### B.  Mandatory or Discretionary Detention

Having determined that this Court has jurisdiction over Mr. Quispe-Ardiles's Petition, it must next determine whether Mr. Quispe-Ardiles's detention is governed by the mandatory detention provisions in 8 U.S.C. § 1225(b)(2) or the discretionary detention provisions in 8 U.S.C. § 1226(a).[11] *See Hasan*, 2025 WL 2682255, at *5 (explaining that "noncitizens detained under Section 1225(b)(2) must remain in custody for the duration of their removal proceedings, while those detained under Section 1226(a) are entitled to a bond hearing before an IJ at any time before entry of a final removal order" (quoting *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1247 (W.D. Wash. 2025))). Federal respondents, recycling the identical arguments they raised in *Hasan*, contend that Mr. Quispe-Ardiles is an "applicant for admission" and therefore subject to mandatory detention under 8 U.S.C. § 1225(b)(2). ECF 14-17. Mr. Quispe-Ardiles contends—and the IJ found—that federal respondents have detained him under 8 U.S.C. § 1226(a). ECF 14 at 11-14; ECF 2-5 at 3. This Court agrees with Mr. Quispe-Ardiles and concludes that § 1226(a) governs his detention.[12]

---

[11] In his Reply Memorandum in Support of Petition for Writ of Habeas Corpus and Complaint for Declaratory Relief, Mr. Quispe-Ardiles asserts that this Court may adjudicate his petition without "look[ing] behind" the IJ's determination that he is detained pursuant to § 1226(a). ECF 14 at 6-7. He argues that because he is currently detained pursuant to the automatic stay provision of 8 C.F.R. § 1003.19(i)(2), this Court need only address whether that regulation violates due process. *Id.* Mr. Quispe-Ardiles's Petition, however, asks for a declaration that he is not an "arriving alien" who might be subject to § 1225(b). ECF 2 at ¶ 54. This Court will thus address whether § 1225(b) or § 1226 applies.

[12] Federal courts throughout the country have similarly found that § 1226(a) applies to noncitizens without lawful status who are arrested within the country. *See, e.g.*, *Leal-Hernandez*, 2025 WL 2430025, at *8-10; *Maldonado*, 2025 WL 2374411, at *11-13; *Sampiao v. Hyde*, No. 1:25-cv-11981-JEK, 2025 WL 2607924, at *7-8, 11 (D. Mass. Sept. 9, 2025) (collecting cases); *Herrera v. Knight*, No. 2:25-CV-01366-RFB-DJA, 2025 WL 2581792, at *7 n.5 (D. Nev. Sept. 5, 2025) (collecting cases).

The court in *Hasan* has already explained the intricacies of §§ 1225(b) and 1226. *See* 2025 WL 2682255, at *5-6. In sum, § 1225(a)(1) provides that a noncitizen "present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission." The statute defines "applicants for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . ." 8 U.S.C. § 1225(a)(1).

Federal respondents contend that Mr. Quispe-Ardiles is subject to § 1225(b)(2), which provides that, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A). In other words, § 1225(b)(2)(A) generally requires mandatory detention of certain "applicant[s] for admission" during their removal proceedings. *See Hasan*, 2025 WL 2682255, at *5 (describing statutory scheme). Individuals subject to mandatory detention under § 1225(b)(2)(A) may, however, be "temporarily released on parole 'for urgent humanitarian reasons or significant public benefit.'" *Jennings*, 583 U.S. at 288 (quoting § 1182(d)(5)(A)). This parole "shall not be regarded as an admission" of the noncitizen. 8 U.S.C. § 1182(d)(5)(A). Rather, once the purposes of parole have been served, the noncitizen "shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

By contrast, § 1226(a) sets forth "the default rule" for detaining noncitizens "already present in the United States." *Jennings*, 583 U.S. at 303. Section 1226(a) provides that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Unlike

9

§ 1225(b)(2)(A), noncitizens who fall under § 1226(a) are not subject to mandatory detention. Pending a removal decision, the Attorney General may continue to detain an arrested noncitizen, release them on bond, or release them on conditional parole, unless they fall within certain exceptions involving criminal offenses and terrorist activities. *See* 8 U.S.C. § 1226(a) (1)-(2), (c).

As in *Hasan*, federal respondents argue that § 1226(a), and the possibility of release on bond, only applies to individuals who are present in the country with lawful status but are in removal proceedings. ECF 6 at 15-17; *see Hasan*, 2025 WL 2682255, at *6. But that argument "is rooted in a misinterpretation" of this district's prior decisions. *Hasan*, 2025 WL 2682255, at *6. "Section 1226(a) does not contain a requirement of lawful status, and 'courts are not free to read into the language [of a statute] what is not there.'" *Id.* at *6 (quoting *O'Hara v. Nika Techs., Inc.*, 878 F.3d 470, 475 (4th Cir. 2017)).

With respect to Mr. Quispe-Ardiles's status, the federal respondents argue that Mr. Quispe-Ardiles is detained pursuant to § 1225(b)(2) because he entered this country "without inspection," making him inadmissible under 8 U.S.C. § 1182(a). ECF 6 at 14-16. And because "[p]etitioner has not been admitted, as a legal matter" into the United States, he is "still considered an 'applicant for admission.'" *Id.* at 15 (quoting 8 U.S.C. § 1225(b)(2)). This argument fails for several reasons.

First, the federal respondents' treatment of Mr. Quispe-Ardiles since he arrived in the United States supports the conclusion that he is detained pursuant to § 1226(a). Mr. Quispe-Ardiles entered the country without inspection on December 6, 2023. ECF 2-1 at 1. Federal authorities arrested him and, on December 7, 2023, released him on his own recognizance "[i]n accordance with *section 236* of the Immigration and Nationality Act." ECF 2-2 (emphasis added). Federal authorities did not impose a monetary bond or require Mr. Quispe-Ardiles to wear an ankle monitor. *See id.* When ICE detained Mr. Quispe-Ardiles on July 17, 2025, they appear to have

10

rearrested him under an earlier DHS administrative warrant issued pursuant to § 1226(a). *See* ECF 2-5 at 3 (explaining that Mr. Quispe-Ardiles "was detained pursuant to a warrant of arrest issued by DHS years after his entry into the United States following targeted immigration enforcement in Virginia"); 8 U.S.C. § 1226(b) ("The Attorney General at any time may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original warrant, and detain the alien."). The federal respondents have thus consistently treated Mr. Quispe-Ardiles as subject to § 1226(a) up to this point.

The federal respondents nevertheless contend that "[p]etitioner's release from custody" after his initial arrest "has no bearing on his mandatory detention" because "the Secretary may 'for urgent humanitarian reasons or significant public benefit' temporarily parole aliens detained under §§ 1225(b)(1) and (b)(2)." ECF 6 at 15 (quoting *Jennings*, 583 U.S. at 300). But "that argument fails to explain [Mr. Quispe-Ardiles's] release on recognizance." *Hasan*, 2025 WL 2682255, at *7. Individuals detained under § 1225(b) may not be released on recognizance; they may only be paroled into the country under § 1182(d)(5)(A). *See id.* at *7-8 (explaining that release on recognizance is a form of "conditional parole" from detention under § 1226 that is distinct from parole under § 1182(d)(5)(A) (quoting *Martinez v. Hyde*, No. 25-cv-11613, 2025 WL 2084238, at *3 (D. Mass. July 24, 2025))). That distinction is significant. The INA allows an individual paroled into the United States to physically enter the country "subject to a reservation of rights by the Government that it may continue to treat the non-citizen 'as if stopped at the border.'" *Martinez*, 2025 WL 2084238, at *3 (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020)). "On the other hand, conditional parole—including release on recognizance—releases a noncitizen already in the country from domestic detention." *Hasan*, 2025 WL 2682255, at *8 (citing *Thuraissigiam*, 591 U.S. at 139). Individuals paroled into the country are thus "in a

11

fundamentally different and less protected position than 'those who are within the United States after an entry, irrespective of its legality.'" *Id.* (quoting *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958)). DHS's decision to release Mr. Quispe-Ardiles on recognizance and its citations to § 1226 in Mr. Quispe-Ardiles's paperwork do not support its present argument that federal respondents "actually intended for him to be paroled into the United States pursuant to § 1182(d)(5)(A)." *Id.*

Second, this Court agrees with the court's conclusions in *Hasan* that applying § 1225 to all persons who have not been admitted into the United States would conflict with the statute's broader structure, the Supreme Court's traditional understanding of the relationship between §§ 1225(b) and 1226(a), and decades of immigration practice. *See* 2025 WL 2682255, at *8-9. "[O]ne of the most basic . . . . canons" of statutory interpretation is that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)) (internal brackets omitted). Yet federal respondents' theory of § 1225(b)—that the provision applies to all persons who have not been admitted into the United States—would render multiple provisions of § 1226 superfluous. For instance, § 1226(c)(1)(A), (D), and (E) already require mandatory detention of certain categories of inadmissible noncitizens. Indeed, Congress added § 1226(c)(1)(E)—which requires detention for certain inadmissible noncitizens charged with crimes including burglary, theft, and larceny—just this year through the Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). If § 1225(b) already required mandatory detention of all noncitizens who have not been admitted, these provisions would be meaningless. *See, e.g.*, *Martinez*, 2025 WL 2084238, at *7 (concluding same); *Maldonado*, 2025 WL 2374411, at *12 (same); *Hasan*, 2025 WL 2682255, at *8 (same).

The federal respondents' theory also conflicts with the Supreme Court's previous interpretation of the relationship between §§ 1225(b) and 1225(a). For instance, in *Jennings*, the Supreme Court explained that § 1225(b) governs noncitizens "seeking admission into the country," whereas § 1226(a) governs noncitizens "already in the country" who are subject to removal proceedings. 583 U.S. at 289. That interpretation is consistent with the core logic of our immigration system. "[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'" *Leng May Ma*, 357 U.S. at 187 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)); *accord Zadvydas*, 533 U.S. at 693 ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."). Given this precedent, it is "doubtful that Congress intended § 1225(b)(2) to apply" to individuals like Mr. Quispe-Ardiles who were detained after being present in the U.S. for several years, who had not committed any crimes, and who had attended every required meeting with immigration officials. *Hasan*, 2025 WL 2682255, at *8.

Lastly, the federal respondents' argument is at odds with DHS's own historic understanding of the statute's meaning. DHS's longstanding interpretation of § 1226 "like any other interpretive aid—can inform a court's determination of what the law is." *Hasan*, 2025 WL 2682255, at *9 (quoting *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 386 (2024) (cleaned up)). And here, "DHS's long-standing interpretation has been that § 1226(a) applie[d] to those who have crossed the border between ports of entry and are shortly thereafter apprehended." *Id.* (quoting Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*, 597 U.S. 785 (2022) (No. 21-954));

13

*see also Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588, at *8 (S.D.N.Y. Aug. 13, 2025) (observing that DHS's "novel position would expand § 1225(b) far beyond how it has been enforced historically"). DHS's historic practice reinforces § 1226(a)'s application to noncitizens in Mr. Quispe-Ardiles's position who are arrested well after arriving to this country.

For all these reasons, the Court agrees with the IJ who entered Mr. Quispe-Ardiles's release order and concludes that his detention is governed by § 1226(a)'s discretionary framework and not § 1225(b)(2)'s mandatory detention procedures.

### C. Due Process

Having concluded that § 1226(a) governs Mr. Quispe-Ardiles's detention, the Court next considers whether the automatic stay of his release on bond under 8 C.F.R. § 1003.19(i)(2) violates his right to substantive and procedural due process under the Fifth Amendment to the U.S. Constitution.[13]

#### 1. The Automatic Stay Regulation

As explained above, immigration authorities have discretion over whether to detain noncitizens subject to 8 U.S.C. § 1226(a) during the pendency of immigration proceedings. But that discretion has limits. After detaining an individual, ICE officers make an initial determination to either set bond or hold the individual without bond. *See* 8 C.F.R. § 1236.1(c)(8). That determination must be based on whether the individual poses "a danger to property or persons" or is unlikely "to appear for any future proceeding." *Id.* If an officer decides to detain an individual, the person may appeal the bond decision to an IJ. *See* 8 C.F.R. §§ 1003.19(d), (e); *see also Lopez Benitez*, 2025 WL 2371588, at *10 (describing process).

---

[13] The federal respondents argue extensively that the process due to persons subject to mandatory detention under § 1225(b)(2) is limited to the process afforded by the INA. ECF 6 at 17-21. The Court need not address these arguments as it has already found Mr. Quispe-Ardiles's detention to be governed by § 1226(a).

14

The automatic stay regulation comes into play if an IJ determines that an individual should be released on bond. The regulation provides, "[i]n any case in which DHS has determined that an alien should not be released or has set a bond of $10,000 or more, any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon DHS's filing of a notice of intent to appeal the custody redetermination (Form EOIR-43) with the immigration court within one business day of the order." 8 C.F.R. § 1003.19(i)(2). The "automatic stay shall lapse 90 days after the filing of the notice of appeal" if the Board of Immigration Appeals ("BIA") has not acted on the appeal. *Id.* § 1003.6(c)(4). If the noncitizen requests an extension of the BIA's 21-day briefing schedule, that request tolls the 90-day timeframe. *Id.* DHS may also seek a discretionary stay after the automatic stay has elapsed, *id.* § 1003.19(i)(1), which results in an additional 30-day extension, *id.* § 1003.6(c)(5). If the BIA fails to act on DHS's discretionary stay request, "the alien's release shall be automatically stayed for five business days." *Id.* § 1003.6(d). And if, during those five days, DHS refers the case to the Attorney General, "[t]he automatic stay will expire 15 business days after the case is referred to the Attorney General." *Id.* "All told, the automatic stay regulation can hold an individual in custody for approximately 140 days after the IJ's initial bond determination." *Hasan*, 2025 WL 2682255, at *9.

### 2. Substantive Due Process

In Counts III and V, Mr. Quispe-Ardiles claims that his continued detention without bond under the automatic stay regulation violates his right to substantive due process under the Fifth Amendment to the United States Constitution.

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. This guarantee "include[s] a substantive component" which prohibits the government from infringing on certain fundamental

15

liberty interests, regardless of what process the government provides, "unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-02 (1993). "[A]t the heart of the liberty that [the Due Process] Clause protects" is the "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint." *Zadvydas*, 533 U.S. at 690. Government detention violates the Due Process Clause "unless the detention is ordered in a criminal proceeding with adequate procedural protections or, in certain special and narrow nonpunitive circumstances where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Id.* at 690 (internal citations and quotation marks omitted). These protections extend to noncitizens who have entered the country, even if they are in removal proceedings.[14] *See, e.g.*, *id.* at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

As in *Hasan*, the federal respondents have not provided any special justification that might warrant Mr. Quispe-Ardiles's continued detention without bond. "Any interest that the federal respondents may have in securing [Mr. Quispe-Ardiles'] presence at immigration proceedings has been accounted for by the IJ's imposition of bond." *Hasan*, 2025 WL 2682255, at *10; *see also Leal-Hernandez*, 2025 WL 2430025, at *13 (concluding that any flight risk concerns were accounted for by the IJ's imposition of a $10,000 bond on the petitioner's release); *Herrera*, 2025 WL 2581792, at *12 (finding that respondents had not articulated "*any* interest—let alone a compelling interest" to justify the petitioner's continued detention through the automatic stay

---

[14] As the court in *Hasan* explained, the federal respondents are incorrect that Mr. Quispe-Ardiles's lack of legal status means that his substantive due process claim necessarily fails. "[T]he government's discretion to incarcerate non-citizens has always been constrained by the requirements of due process." *Hasan*, 2025 WL 2682255, at *10 n.13 (quoting *Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017)).

16

regulation). The federal respondents also do not contend that Mr. Quispe-Ardiles presents a safety risk or has a criminal record.

Instead, the automatic stay regulation allows DHS to unilaterally detain a person, even after an IJ makes an individualized finding that a person does not pose a threat to the safety of others or a risk of flight. In other words, the automatic stay provision renders the IJ's bond determination "an empty gesture." *Hasan*, 2025 WL 2682255, at *11 (quoting *Ashley v. Ridge*, 288 F. Supp. 2d 662, 668 (D.N.J. 2003)); *accord Leal-Hernandez*, 2025 WL 2430025, at *13. This is the precise kind of arbitrary detention that the Due Process Clause guards against. Mr. Quispe-Ardiles's continued detention pursuant to the automatic stay regulation thus violates his right to substantive due process.

### 3. Procedural Due Process

In Counts III and V, Mr. Quispe-Ardiles claims that the automatic stay regulation and his continued detention without bond violate his right to procedural due process.

To determine whether civil detention violates a detainee's Fifth Amendment procedural due process rights, courts apply the three-part test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Under that test, courts must weigh (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

As to the first factor, Mr. Quispe-Ardiles invokes "the most elemental of liberty interests": "[t]he interest in being free from physical detention." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). Contrary to the federal respondents' arguments, Mr. Quispe-Ardiles is not claiming a

17

liberty interest in remaining in the United States; his Petition does not challenge his ultimate removal proceedings. ECF 6 at 24. Rather, he "is claiming a significant private interest in being free from the physical detention that the IJ found inappropriate." *Hasan*, 2025 WL 2682255, at *11 (citing *Zadvydas*, 533 U.S. at 690 (explaining that an individual's interest in being free from detention "lies at the heart of the liberty that [the Due Process] Clause protects")). The first factor thus weighs heavily in Mr. Quispe-Ardiles's favor.

The second *Mathews* factor considers the risk that the automatic stay regulation will erroneously deprive Mr. Quispe-Ardiles of liberty and the degree to which alternative procedures may ameliorate that risk. The risk here is substantial. As an initial matter, the automatic stay provision does not require DHS to account for "any individualized facts" that may support a person's release or make any particularized justification to deprive that person of liberty. *Hasan*, 2025 WL 2682255, at *12; *see also Gunaydin v. Trump*, 784 F. Supp. 3d 1175, 1188 (D. Minn. 2025) (concluding same). Furthermore, the automatic stay regulation applies "only [to] those noncitizens who have already demonstrated their entitlement to release from detention." *Sampiao*, 2025 WL 2607924, at *10. In other words, the "regulation empowers ICE—the losing party in the bond hearing—to unilaterally override the decision of the Judge and keep the noncitizen detained pending appeal. Such a rule allows the government to bypass its burden of proof at bond hearings and usurp the role of the Immigration Judge." *Id.* The regulation is "an anomaly in this country's legal system," *Hasan*, 2025 WL 2682255, at *12, and "nullifies the very purpose of giving aliens procedural protections in deportation proceedings" to begin with, *Ashley*, 288 F. Supp. 2d at 671.

As to the probable value of additional procedural safeguards, "it is not difficult to conclude that *any* additional procedure is valuable where, as here, the only procedure required for continued detention appears to be an agency official checking a box and filing a form." *Hasan*, 2025 WL

18

2682255, at *12 (quoting *Herrera*, 2025 WL 2581792, at *11). Moreover, regulations already exist under which DHS may contest an IJ's bond determination with far less risk of error. For instance, 8 C.F.R. § 1003.19(i)(1) allows DHS to request a discretionary stay of an individual's release on bond through which the BIA considers the individual circumstances and merits of the request. And 8 C.F.R. § 1236.1(d)(3) sets forth procedures for DHS to appeal an IJ's adverse bond decision. *See Hasan*, 2025 WL 2682255, at *12 (explaining that these "alternative procedures" could lessen the risk of erroneous deprivation while preserving the government's interest in preventing an erroneous release).

Turning to the third and final *Mathews* factor, the Court discerns no significant governmental interest in continuing to hold Mr. Quispe-Ardiles without bond. The federal respondents broadly assert that immigration enforcement is a "vital public interest." ECF 6 at 27 (internal citation omitted). But they have not explained how that interest is insufficiently protected by the INA's existing processes and the IJ's individualized determination that Mr. Quispe-Ardiles does not pose a flight risk. *See* ECF 2-5 at 4. And while the federal respondents contend that there "is always a public interest in prompt execution of removal orders" (ECF 6 at 28 (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)), there is no order of removal pending against Mr. Quispe-Ardiles, who is seeking asylum. Under the circumstances, the interests advanced by the automatic stay regulation do not appear weighty, especially when compared against Mr. Quispe-Ardiles's strong interest in freedom and the risk of error in depriving him of that freedom. Indeed, "[i]n failing to articulate 'why detaining noncitizens who have prevailed at a bond hearing is necessary to enforcing immigration law, the question arises whether the detention is not to facilitate deportation, or to protect against the risk of flight or dangerousness, but to incarcerate for other

reasons.'" *Hasan*, 2025 WL 2682255, at *12 (quoting *Herrera*, 2025 WL 2581792, at *11) (internal quotation marks omitted).

Given the significant liberty interest at stake, the high risk of erroneous deprivation, and the lack of government interest in his detention, the Court concludes that Mr. Quispe-Ardiles's ongoing detention without bond plainly violates his right to procedural due process.

## IV.    CONCLUSION

For the reasons stated above, Mr. Quispe-Ardiles's Petition will be granted as to Counts I, II, III, and V by an Order to be issued with this Memorandum Opinion, which will require the respondents to immediately release Mr. Quispe-Ardiles from custody.

**SO ORDERED.**

/s/
Michael S. Nachmanoff
United States District Judge

September 30, 2025
Alexandria, Virginia